May it please the Court, my name is Mark Kennedy. I represent Sahara Health Care, appellant in this case. We are here today to ask this Court to reverse the 12B6 dismissals of the claims alleged in our case and remand the case to the trial court. The facts in this case are simple. Our client is a home health agency. It appealed a $3.5 million overpayment liability and in the first two administrative stages of the four-stage administrative process, they reduced the liability $1 million to approximately $2.5 million. However, the ALJ hearing that is required at the third stage of the administrative process has not been made available to the provider within 90 days as required by statute. The provider has waited one and a half years and may wait as long as five years for the ALJ hearing. But couldn't your client have gone immediately to step four? It could have escalated the case to step four, but it could not have obtained the trial-type hearing that is required by statute at the third stage of the administrative process. And that is the essence of the alleged violation of due process that we contend. We're not contending that the process is constitutionally inadequate. We are contending that the failure to provide a trial-type hearing required by Congress that is essential to the administrative process was denied to this provider and that escalation does not protect the procedural interests that are available in a trial-type proceeding. So what would the escalation? It would have just been... The escalation is a procedural push. Right. But what would have happened if you say it wouldn't be a trial-type? You would have advanced the case to the fourth stage of the administrative process. Right. The Medicare Appeals Council. The Medicare Appeals Council most likely would consider the case and remand it for a trial-type proceeding before an ALJ. But couldn't you say it must be done in 14 days or something? I mean, it could have... Well... If you're in a desperate situation, as you indicate your client was, going there to that tribunal could have given some relief, couldn't it have? Actually, it would not provide any relief. Our experience when moving cases to the fourth stage to the Medicare Appeals Council, the delay is as substantial as the delay before the ALJ hearing. And ordinarily, what happens at that level is that the Medicare Appeals Council considers and remands the case for further proceedings at an administrative level below. Could I ask... You know, you talk about a trial-type hearing. It's not actually a trial-type hearing, is it? Because under the CFR, you're not allowed to cross-examine the government witnesses even in that proceeding, are you? Actually, you are. Oh, I thought 4051036F1 said you can't subpoena anyone and you can't compel an appearance. That's correct. The authority cited by the government is that you cannot compel appearance or that you cannot subpoena the contractor. However, the administrative process contemplated is one in which the government actually may join as a party. It did not join as a party in this case, but it can join as a party and the provider has an opportunity to cross-examine witnesses. But in this case, if the government is not joined in as a party, then there's no one to cross-examine if you can't subpoena or bring witnesses. So how are you denied due process? Because the rules themselves would not have allowed you this trial-type hearing that we, who are experienced in trials, contemplate. Well, the fact that there may not be a witness to cross-examine does not demean that this is a trial-type hearing. It is still a live hearing before a federal administrative law judge. The most important thing in this particular administrative process, understand that this is a multi-tiered administrative process. The first two stages, the pre-hearing stages, if you will, are designed to eliminate the easy errors that may be made at imposing the administrative determination. And in fact, your client had some benefit there. That's right, but that negates that the most crucial stage is really the ALJ hearing. It's not the reverse. It doesn't work in that you have administrative proceeding at a pre-hearing stage and that makes redundant an ALJ hearing. It actually makes it more important to have an ALJ hearing because to deny the later stages of the hearing is really to deny the provider the administrative remedy that Congress prescribed under the statute. I have a question about whether there is a property interest. I don't believe you addressed our decision in personal care products versus Hawkins, which held that a provider lacks a property interest in its present reimbursement claims while past claims are under investigation. How do you distinguish this case? Well, first of all, the trial court misanalyzed the interest that we alleged. The trial court suggested that we were alleging an interest in the overpaid claims. We are not. We are alleging an interest in the earned Medicare payments that are being confiscated by the federal government. The federal government is a process of collection. It collects the earned Medicare payments and it applies those to the debt to liquidate the debt, same as cash. We contend that we have a property interest in the earned Medicare payments. That property interest was recognized in Family Rehab, MedCert, Adams, Infinity. In fact, this court has recognized in a different context that a party has a property interest in earned monies. In the case, it's a new authority that we became aware of, NOAA against King, 732 Fed 3rd, 479, 2013. Is this a new case you're bringing to our attention while you waited here this morning? I did not have an opportunity. I did not share that with him, NOAA. You did have an opportunity. I did have the opportunity. I did not share it, but I have a duty to this court when I find controlling precedent that I was unaware of to share it. Right, but there is a method to do that that also doesn't surprise opposing counsel. I apologize to the government. And opposing counsel will have the right to file a 28-J on that case. Understood. You may proceed. And we contend that with respect to the earned Medicare payments, that there is a legitimate claim of entitlement to money earned as recognized by Family Rehab, MedCert, Adams, and Infinity, and again, and I apologize to the government, in the NOAA against King case. It's distinguishable from the personal care products case. Personal care products was a Medicaid case, and it analyzed payment hold as opposed to Medicare recoupment. Payment hold is an authority that is available to the state, unique to the state of Texas, that allows the government to withhold future Medicaid reimbursement because current payments are tainted by fraud. And because the payments are tainted by fraud, there is not a legitimate claim of entitlement to the future reimbursement. But it is unique and distinguishable from recoupment where the provider has a legitimate claim of entitlement in the earned payments that are being applied to actually liquidate the liability, same as cash. It's the provider's cash that's being confiscated and applied against the debt to liquidate it. The debt actually is reduced by recoupment. So, suppose your client had a contract, not to participate in the Medicare program, but had a contract to provide services to the government. Provide the services to the government, the government owes you a million dollars. And then, instead of paying you the million dollars, the government says, we don't want to pay you the million dollars, we're going to stand on our sovereign immunity, and you can try to sue us if you want to. The way that would normally work under the Tucker Act is you have to go to the Court of Federal Claims, and there's a whole process that the statute has established that you could sue for breach of contract. But it strikes me that under your theory of a property interest, if the government repealed the Tucker Act and said, you know what, we're not going to pay you, this is a risk of you doing business with the government, we can stand on sovereign immunity, and you have no remedy at all, you would say that violates the Due Process Clause? I would, and I think the distinction there, as I understand it, is that we are seeking to enjoin, temporarily, the recoupment authority that the government has to confiscate earned Medicare payments. Please understand that the debt that we are talking about is an alleged debt. It's an overpayment that is not final, and this is a pre-debt collection tool, which raises, to one of the points I wanted to address, the government has not adequately explained, or explained at all, to my understanding, that it has conceded, under Texas v. United States, that the ACA is unconstitutional. And the recoupment authority, alleged, or the recoupment authority, 42 U.S.C. 1395 D.D.D., was promulgated under the ACA. So, in effect, the government is asserting to collect the earned Medicare payments using an authority that it has conceded is unconstitutional. In fact, the government has not alleged that it has any proper authority to collect pre-debt monies. That was the authority that it had, that Congress provided. However, the government has conceded, in Texas v. United States, that it is not constitutional. And we contend, for that reason alone, it improperly is recouping money. We would also contend that the recoupment that is being imposed under Triple D is an illicit recoupment that is under a much harsher scheme than contemplated by Congress. Every trial court that considered this issue made a similar determination that Congress did not countenance that a provider might be subject to recoupment for five years when the government denies it the very opportunity to contest the debt that is being liquidated. In other words, the government's collecting a debt that we can't challenge in accordance with the promulgated and congressionally established process under 42 U.S.C. 1395 F.F. Is there evidence in the record that Sahara might go insolvent while it waits? I know it's in the brief, but is there anything in the record that could be cited for that proposition? Yes. In our brief, I think that was at pages 6 through 30 of the administrative record, we reflect in the allegations that our provider client will be forced to shut down. That's on page 19 of your brief, but is there something in the record that would substantiate that, that could be used? I don't know the citation, but the record includes the provider's motion for a temporary restraining order that was supported by declaration that made allegations that it would be forced to shut down. The declaration of your client. That's correct. But I have to advise the court that since this appeal was filed, and as we made clear to the court that initially the federal government denied our client a repayment plan, we requested a 300 month repayment plan, the government countered with a 60 month repayment plan that was one that we could not pay under. It since has approved a repayment plan, a graduated repayment plan that requires $10,000 a month payments that we are presently paying and desperately trying to continue to pay. However, it's a graduated plan and on 2-1-21, the $10,000 payments will become $75,000 payments and they will be graduated the year after that to $95,000 and the following year to $110,000 at a 9.5% interest. Our client is at a point that it's going to default on that plan. It cannot continue under this arrangement much longer. And once it does, 100% recoupment will be imposed and we have the very problems that we've been arguing about throughout the duration of this case. And it's not, so this doesn't in any way moot your case because you believe the recoupment scheme is inappropriate anyway, unconstitutional and ultra-vires and so many other things. I'm not sure of the question on that, Your Honor. So I'm just saying, why is it not moot? It's not moot because the threat of 100% recoupment remains and our client is financially unable to continue paying under a plan for five years when it's being denied the administrative process and in particular, a trial-type hearing that Congress prescribed and that is critical. And every judge that's considered this precise issue has found that to be the case. Are you still in the queue? Yes, we are still at the ALJ level. But I mean, yes, so you're still- We're in line waiting. By coming and doing all of this, you've not lost your place in the line. No, not to my knowledge. And I certainly hope that that's not the case, that we, by asserting a constitutional right, would lose our constitutional right to the prescribed remedy that Congress established under 1395 FF. Thank you, Counsel. You've set the record on the record. Thank you, Your Honor, and may it please the Court. Joshua Salzman on behalf of HHS. At the outset, I just want to clear up a couple of key points. First, I just want to emphasize at the beginning that we're here on a constitutional claim alleging procedural due process. And therefore, is it the relevant inquiry whether a plaintiff has received all of the process contemplated by the Medicare statute? As this Court and the Supreme Court have repeatedly recognized, not every statutory violation rises to the level of a constitutional violation when a failure to provide process is alleged. All that matters is whether a plaintiff has received notice and a meaningful opportunity to be heard. That's the constitutional standard. And I'll walk through why I think that's been readily satisfied here. How much longer will they have to wait? I don't think we have an exact estimate. What I can tell you is we're already under a mandamus order from the District of Columbia from the litigation brought by the American Hospital Association, under which the backlog has to be completely resolved by the end of 2022. And there are targets that the agency has been required to meet and has been meeting to reduce it by set percentages. That order was entered in 2018, and we've been filing regular status reports in that litigation. Are they in chronological order being called? Exactly. So where is this in the backlog? Is it in the middle or the beginning? Because they have to get, if he's correct, they need to be helped by 2021 in February. I don't think I have access to the information to know exactly where. I don't think there's a precise projection of when their case is likely to be heard as these things are resolved, as Your Honor said, on a first-in, first-out basis. The other thing I want to emphasize at the outset here is I want to walk through how this process works. Because the two levels of review that plaintiff received before recoupment began were quite meaningful, as evidenced by the fact that plaintiff was able to substantially reduce the overpayment. Now, the way this works is this is sort of like an open-ended contract where the plaintiff is the vendor, and the vendor submits facially valid claims to the government, and the government pays them without going in and closely investigating. But the statute and regulations are very clear that in order to protect the Medicare trust funds on the back end, we're going to come in sometimes and audit, and then the burden is on the plaintiff to come on the provider to have the records to back up that claim. Now, once that happens, here, plaintiff was paid, but with the understanding there could be recoupment later on, an auditor came, found a substantial overpayment, and then plaintiff was required to come through with the documents that showed that, in fact, those payments were justified. And the regulations say at that first level of administrative review, the plaintiff can put in any evidence, any argument it wants to, build that record, and then the plaintiff did so. That first-level reviewer who had no financial stake in the outcome took a look and reduced the overpayment in part. Then there's a second level of administrative review. Again, the plaintiff had the opportunity to correct any deficiencies, to come forward with more documents, come forward with expert testimony if they wanted to, put in any documents, any argument they wanted to, put in a written presentation. And again, an impartial adjudicator took a close look at that and further reduced the overpayment. Does the United States not have a position on whether there's a property interest at issue in this case? So what we've said is that you can assume that there's at least a sufficient property interest to get you into the three-part Matthews versus Eldridge test, but we think whatever property interest is here is limited, and therefore, under the first of the three Eldridge factors, that's certainly something that should be taken into account in light of this Court's precedent in personal care products, in light of the fact that the statute is quite clear that payments are contingent on subsequent possible recoupment and the nature of the relationship. So it is not the United States' position that there is no property interest? Right. So we are not asking you to reject this at the threshold. We're not saying rule that there's no property interest here and don't even do the Eldridge balancing, but because the Eldridge balancing includes consideration of the nature of the property interest, what we're saying is that that interest is quite slight. Okay. Well, what do you say about the ACA argument? You know, the courtroom just down the hall, the government said the ACA is unconstitutional and inseverable. That's absolutely right, Your Honor, but there are many problems with the argument, but there are two easy reasons that this Court can reject it. One is it was raised for the first time in a reply brief, and this Court normally doesn't consider arguments like that. The other problem with that argument— No, but you can hold the government to its position, unless you're taking—it's one of these ones where the agencies disagree with the argument. Oh, not at all, Your Honor. So the other reason you can reject that argument is they're just flat wrong that the recoupment authority comes from the Affordable Care Act. Tell us where it does come from. Well, so it comes from several sources, but even the provision they're talking about, you've got a statutory provision in the U.S. Code, 42 U.S.C. 1395 DDD. It's a very lengthy provision that codifies aspects of many different statutes. The relevant portion of that provision that's relevant to recoupment is codified in Subsection F. The Affordable Care Act had nothing to do with Subsection F. Subsection F long predated the Affordable Care Act, and the Affordable Care Act made no changes to Subsection F. Much further down in that statutory codification—I think it's in Subsection H or Subsection J—there were some changes made that were codified there that come from the Affordable Care Act. But even if this Court were to wipe the Affordable Care Act completely off the books, 1395 DDD Subpart F would still be intact. Thank you. You note that the wrongly recouped funds could be repaid with interest if they are wrongly recouped. Absolutely. But how does that help Sahara if it goes unsolvent while it waits? Well, two things on that, Your Honor. So first, they have two avenues for relief, and I think both have been touched on already today. One is the escalation mechanism. To the extent that they cannot wait, they have the ability to skip to the fourth level of review and then potentially straight to judicial review. Can you help us as to what is not available or is still available? Compare three and four. Sure. So three is a hearing before an administrative law judge. They can put on live testimony. However, those things are normally about an hour and a half. They're conducted telephonically. And as Your Honor correctly recognized earlier, they have no power to compel the government to participate. The government has a right to intervene as a party, but it doesn't have to. And if the government doesn't choose to do that, there's no subpoena power over the government and no ability to cross-examine government or contractor witnesses. At the fourth level of review, what you have is the Departmental Entity that provides—generally, it has the theoretical power to conduct a live hearing, but that's only in extraordinary circumstances. In practice, it normally performs record review. And then ultimately, there's— So what it can do, it has the powers of three, but in extraordinary circumstances? In practice, it's very seldom—I don't want to mislead the Court—it very seldom exercises the power to conduct a live hearing. In practice, it performs record review. And then following that, either if they get a decision from that fourth level of reviewer, or if they wait too long for the fourth level of reviewer to act, they still have that power to escalate again and to go directly to district court. And if you go to district court and you haven't yet had a live hearing, can the district court order a live hearing, or is it one of these situations where you have to take the records from the agency as is? I think the Court would have theoretical power to expand the record. It is a record review kind of circumstance. It's litigation brought under a statutory provision called 42 U.S.C. 405G. So the district court could enlarge the record and conduct whatever proceedings were consistent with process? I think that would be part of the Court's inherent authority. I don't think that should be the norm. But I don't think that's really a problem because the key documents here are their documents that are supposed to substantiate that these services were provided and that these services were reasonable and necessary. They should have had all of those materials and they should have already put them in the record. They were under a statutory duty by the time the second level of review was completed to have put those materials into the record. So this isn't a case where they've been denied the opportunity to shape the necessary record. I think that I've touched on all of the points I was hoping to address, so unless the panel has further questions. Do you have any comments on Hawkins? The Hawkins case. I apologize, Your Honor, I'm not aware of that. Personal care products. That's the personal care. Oh, personal care products. Sorry, I called it. But you had already mentioned it briefly, but is that all you want to say about it? Well, I do think it helps illustrate how limited the property interest potentially at issue is here. What that case says is you look at the statutory and regulatory scheme in a program that was Medicaid, not Medicare, but that bears a lot of resemblances to here to understand how much of a vested interest in the property the provider has. Here, the relevant statutory provision is 42 U.S.C. 1395G, subsection A, and what that makes clear is that our payments are subject to adjustment for necessary overpayments when they're identified. So in a similar way, if you look to the statute, if you look to the regulations that they were operating under, they had ample warning that there was a potential for recoupment here. Okay. Assuming, arguendo, that there were not a mandamus against the agency in this respect, ordering this to be done, cleaned up, if HHS were to announce that because we have a surplus of appeals and we won't get to them for five years or a decade or whatever, we're going to hereby just cancel off future step three and step four because it's an elusive procedure. I didn't say right. I said procedure. And you can just go immediately to judicial review after step two. Would that be ultra-virus? Would it be ultra-virus? I don't think it would violate due process. I think in terms of ultra-virus, I'm not really sure. I guess there would be a statute saying that the agency should be performing these. So to the extent that the agency has any adjudicative capacity, then it should be using that capacity that it has. If Congress defunded the relevant programs, though, then I think the agency would be under no choice but to do it. Here, that was sort of somewhat analogous to what was at issue in the American Hospital Association litigation. This is part of the reason I asked the hypo. Yeah. Can you help? So I think it would be ultra-virus if the agency had adjudicative capacity and didn't use it. I don't think it would be ultra-virus. I don't think you can compel an agency to do something if it simply lacks the funding or the resources necessary to complete that obligation. Thank you. Thank you, Your Honor. A couple of points, Your Honor. Calling the court again to the reason we are here, and that is to look at the 12B6 motion that was granted and dismissed the claim. The trial court exceeded the authority of Iqbal and went beyond looking to see whether there was a plausible claim. There was an explicitly pleaded property interest that the government concedes is a property interest, yet the trial court went further and determined that there was no valid property interest and determined the merits and went beyond what is required in surviving a motion to dismiss a 12B6. We have to assert a plausible claim. We did. We asserted facts from which the trial court could infer liability. And we asserted a property interest, which the government does not dispute exists. I would go further. This case really goes to whether the government has authority for its position. They have not cited any authority that supports denying a trial-type hearing required by statute under a scheme promulgated by Congress. Nothing supports denying the trial-type hearing that is required at the third stage, and that is essentially what the government is doing. And more importantly, that particular trial-type hearing is crucial, not redundant. That's what the government seems to argue, that if you get the first two stages, which is attended to by the lowest-level analysis by administrative folks, that if you get a decision, you shouldn't be able to challenge it before a federal judge that is trained to adjudicate these types of more complex issues that are not resolved at the lower stages. So rather than the third stage becoming redundant and unnecessary, it becomes crucial and a violation of due process to deny it to a provider, as is the government, and by imposing a recoupment under a scheme that is illicit and harsher than what Congress contemplated. Every trial court that has considered this issue has said that. They said Congress did not contemplate that a provider would have to undergo recoupment for five years while it awaits a hearing to determine the very debt that's being collected is a valid debt. Furthermore, this particular issue of recoupment, they have conceded that recoupment is unconstitutional. I take issue with the government's position that that 1395 Triple D and the recoupment authority, a pre-debt collection tool, was not promulgated under the Act. Our research on Westlaw suggests, and it shows, it's unconstitutional. It's redlined. It's red flagged. We believe clearly that is a part and parcel of the ACA. Finally, to sum this up, it's a simple equation. The government's failure to adhere to the congressionally promulgated administrative process plus imposing recoupment under an illicit and harsher scheme equals irreparable harm in a violation of due process and an infringement upon the provider's interest, not as the trial court mischaracterized the interest, an interest in earned Medicare payments that are actually being confiscated to liquidate and pay off a debt that we cannot challenge. That is unconstitutional and we contend that the court should reverse the trial court and remand this case for further proceedings. Thank you very much. We appreciate your arguments today and this case is submitted. The court will stand adjourned pursuant to the usual order. Thank you.